A & M OPERATING COMPANY, INC. d/b/a Custom Vessel Company a/k/a Custom Coastal Fabricating, Inc., Debtor.

SOUTH COAST SUPPLY COMPANY, INC., Plaintiff,

v.

A & M OPERATING COMPANY, INC. d/b/a Custom Vessel Company, et al., Defendant.

The RALPH M. PARSONS CO., Plaintiff,

v.

A & M OPERATING COMPANY, INC. d/b/a Custom Vessel Company and South Coast Supply Company, Inc., Defendants,

Orange Bank, Intervenor.

The M.W. KELLOGG COMPANY, Plaintiff,

v.

A & M OPERATING COMPANY, INC. d/b/a Custom Vessel Company and South Coast Supply Co., Inc., Defendants.

Bankruptcy No. 93–60018–S.
Adv. Nos. A–93–6002–S, A–93–6003–S, A–93–6005–S, A–93–6006–S and A–93–6009–S.

United States Bankruptcy Court, E.D. Texas, Tyler Division.

Aug. 31, 1993.

Jason Riley Searcy, Longview, TX, Glenn W. Merrick and Sara A. Moon, Davis Graham & Stubbs, Denver, CO, for the Ralph M. Parsons Co.

William Sheehy, Wilson Miller Spivey Sheehy & Knowles, Tyler, TX, for A & M Operating Co., Inc. d/b/a Custom Vessel Co.

Frank Edward Billings, Billings & Solomon and Wayne Kitchens, Houston, TX, for South Coast Supply Co., Inc.

## OPINION

DONALD R. SHARP, Bankruptcy Judge.

Comes now before the Court two complaints filed by South Coast Supply Company, Inc. seeking declaratory judgment; two complaints filed by the Ralph M. Parsons Company to determine the validity/priority/extent of liens; and the complaint of the M.W. Kellogg Company for injunctive relief. Due to the existence of common questions of fact and law, the Court ordered the consolidation of these matters for hearing. This opinion constitutes findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052 and disposes of all issues before the Court.

## FACTUAL AND PROCEDURAL BACKGROUND

A & M Operating Company, Inc. d/b/a Custom Vessel Company, Inc., hereinafter referred to as ("Debtor"), is a business with offices in Orange, Orange county, Texas, and Longview, Gregg county, Texas, which specializes in the building of certain chattels known in the industry as high pressure vessels. Generally, a vessel is a cylindrical steel object, built to withstand certain pressures and temperatures. It is designed to do a specific process in the oil field or in the petro-chemical industry. These vessels are extremely large, heavy, complex and expensive—some cost over one million dollars. Because these vessels are designed for a specific application, Debtor builds them on a custom basis pursuant to the ultimate purchaser's instructions.

Many of the sub-components used in constructing these vessels consist of certain nozzles, flanges, stubs and various other fittings. One of Debtor's main suppliers of these types of components was South Coast Supply Company, Inc., hereinafter referred to as ("South Coast"), a company located in Orange, Texas. It is undisputed that South Coast is not a manufacturer of these components but functions solely as a supplier. In its capacity as a supplier, South Coast maintains a significant inventory in stock of the more commonly used components. However, from time to time, due to the intricacies of the design specifications of the vessels Debtor constructed, Debtor was required to obtain components which differed from those normally maintained in stock. As a general matter, these nonstock items were distinguishable with regard to the length and size of the component as well as its ability to withstand either higher or lower temperatures than that expected of standard stock material. To accommodate such special orders, South Coast maintained a relationship with a firm located in Orange, Texas, known as Forged Vessel Connections, Inc., hereinafter referred to as ("FVC"). Whereas South Coast was solely in the business of supplying these components, FVC was a manufacturer of the components. The testimony is clear that South Coast and FVC maintained a relationship whereby any orders for components not maintained in South Coast's stocks, placed either directly with FVC or indirectly through South Coast, were billed directly to customers, including Debtor, solely by South Coast.

Debtor began to experience extreme financial difficulties in the latter part of 1992. As a result of these difficulties, Debtor was unable to pay South Coast for approximately $656,462.27 worth of components sold to Debtor on open account. Concerned that Debtor was about to transfer ownership of certain of the vessels, South Coast filed state court actions in Gregg County, Texas, and Orange County, Texas, asserting its rights, as a materialman, pursuant to the Texas constitution, to a mechanic's lien on the vessels in Debtor's possession to the extent such vessels were built with components supplied by South Coast. It is undisputed that South Coast has not perfected a security interest in the components in accordance with the Texas Business and Commerce Code [1] or perfected a statutory mechanic's lien pursuant to the

---

1. Tex.Bus. & Com.Code Ann. § 9.314 (Vernon 1991 and Supp.1993).

Texas Property Code.[2] In conjunction with the state court suits filed by South Coast, South Coast caused to be issued a prejudgment order of sequestration effectively impounding numerous vessels under construction at Debtor's facilities.[3] Together, the orders of sequestration required as a condition of replevy of the vessels seized payment of $323,218.06. The replevy of each individual vessel is dependent on the dollar amount of material supplied by South Coast towards the construction of the vessel.

■ As a result of South Coast's actions, as well as other related financial concerns, Debtor filed for relief under Chapter 11 of the Code in early January, 1993. In response, South Coast removed the state court lawsuits pending in Gregg County, Texas, and Orange County, Texas, to this Court. These removed state court lawsuits are numbered A–93–6002 and A–93–6003 respectively. Three additional adversary proceedings concerning the same basic issues of law and fact were subsequently filed by two of Debtor's customers: the Ralph Parsons Company, hereinafter referred to as ("Parsons"), and the M.W. Kellogg Company, hereinafter referred to as ("Kellogg"). In adversary A–93–6005 and A–93–6006 Parsons seeks a determination of the lien priorities to two vessels which it had commissioned Debtor to build. The vessel in A–93–6006 is subject to the claims of Parsons, Debtor, and South Coast; as of the date of the hearing, no claims have been made against the vessel in A–93–6005 and that controversy appears to be moot. Similarly, in A–93–6009 Kellogg has filed suit seeking injunctive relief to resolve competing claim interests among Kellogg, Debtor, and South Coast to four of its vessels. In both the Parsons' and Kellogg's adversaries, it is uncontroverted that Debtor was unable to complete construction of the vessels and both Parsons and Kellogg elected to obtain the services of another contractor to complete their construction beginning in late December, 1992. This election to "cover"[4] was made after both Parsons and Kellogg had paid to Debtor substantial amounts of money pursuant to their original agreements. In both cases, the ultimate cost of completion of the vessels was significantly higher than that contracted for with Debtor. While South Coast alleges an interest, by virtue of a constitutional mechanic's lien, in the vessels at issue in Parsons' adversary A–93–6006 and the vessels at issue in the Kellogg adversary, only the vessel at issue in A–93–6006 is subject to the original order of sequestration. Finally, both Debtor and Parsons assert that South Coast's actions in obtaining orders of sequestration was wrongful and seek damages. *See* Tex.Civ.Prac. & Rem.Code Ann. § 62.044 (Vernon 1986 and Supp.1993).

As of the date of the hearing, through agreement among the parties, cash bonds and letters of credit have been substituted for the vessels. Because Debtor, Kellogg, and Parsons announced a resolution of their disputes in open court[5] the only matter remaining before this Court concerns whether South Coast is entitled to a constitutional mechanic's lien in its capacity as a materialman. Debtor, Parsons and Kellogg are united in their opposition to South Coast's assertion. In the event South Coast is found to possess a valid constitutional mechanic's lien, there is a further dispute over the priority such a lien is to be accorded. Debtor's main working capital lender is Orange Bank of

---

**2.** Tex.Prop.Code Ann. § 53.001 *et seq.* (Vernon 1984 and Supp.1993). The Texas Property Code does not provide for a statutory mechanic's lien on a chattel.

**3.** South Coast's orders of sequestration affected one vessel ordered by the Ralph Parsons Company, four vessels ordered by Howe–Baker, one vessel ordered by Hunt Oil Company, two vessels ordered by Litwin (Total Petroleum), one vessel ordered by Badger/Koch, and two vessels ordered by Dow Chemical. With the exception of the Ralph Parsons Company, none of these companies are parties to any of the adversary proceedings before the Court.

**4.** Section 2.712 of the Texas Business and Commerce Code provides that a buyer of goods may, after a breach of a seller's obligation to deliver goods conforming to a contract, elect to obtain substitute performance from a third party. A buyer electing to "cover" is entitled to recover as damages from the breaching seller the difference between the contract price of the goods and their "cover" price. Tex.Bus. & Com.Code Ann. § 2.712 (Vernon 1968 and Supp.1993).

**5.** Through oversight the terms of these agreements were not announced into the record.

Orange, Texas. Orange Bank established a two million dollar line of credit for Debtor on March 12, 1992. The line of credit was secured by accounts receivable, work in process, and inventory. This security interest was perfected by Orange Bank's filing of a UCC–1 with the Texas Secretary of State on March 17, 1992. It is undisputed that the earliest date upon which South Coast shipped materials to Debtor, which are the subject of these adversary proceedings, was on July 31, 1992. At all times relevant to this proceeding, Debtor's loan balance with Orange Bank has averaged approximately 1.5 million dollars. Orange Bank asserts that to the extent South Coast is granted a constitutional mechanic's lien in any of the vessels that such lien be subordinate to its first priority status. This position is rejected by South Coast. After a heavily contested hearing, the matter was taken under advisement pending the submission of written briefs.

### DISCUSSION OF LAW

 In Texas, the law recognizes two forms of mechanic's liens. The most common is a creature of statutory construction and is found in § 53.001 *et seq.* of the Texas Property Code. This statutory mechanic's lien protects laborers and materialmen who come within its terms for the labor and/or materials consumed in the construction of improvements on real property; however, no protection is offered to those who labor to produce or repair chattels. For this reason, since the vessels in this case are chattels, the statutory provisions in the Texas Property Code relating to mechanic's liens are generally irrelevant. The second form of mechanic's lien existing in Texas is one guaranteed by Article 16, § 37 of the Texas constitution. Unlike its statutory counterpart, a constitutional mechanic's lien is self-executing between the laborer or materialman and those for whom they have labored or provided materials. *First Nat'l Bank in Dallas v. Whirlpool,* 517 S.W.2d 262, 267 (Tex.1974). A constitutional mechanic's lien can arise in the context of either real property or chattels. It is the relationship of such a lien to chattels which is the subject of this Court's review.

 Article 16, § 37 of the Texas Constitution provides as follows:

Mechanics, artisans and material men, of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon, or material furnished therefor; and the Legislature shall provide by law for the speedy and efficient enforcement of said liens.

Tex. Const.Ann. art. 16, § 37 (Vernon 1955). Debtor argues that this constitutional provision should not be read to accord constitutional lien status to providers of materials as a class but simply to acknowledge that a mechanic or artisan is entitled to a constitutional mechanic's lien not only for his labor but for materials consumed by that mechanic or artisan in the performance of his labor. The Court finds such a reading of the Texas constitution to be unpersuasive. By its plain terms, materialmen are referred to, conjunctively with mechanics and artisans, as a class. It is undisputed that South Coast provided material to Debtor in order to facilitate the construction of vessels. South Coast is a materialman. However, in construing this constitutional provision Texas courts have limited its reach in two respects. First, in order to prevent undue burdens on commerce, the assertion of a constitutional mechanic's lien has been limited to those parties which are in privity with the owner of the real property or chattel. Second, in the case of chattels, the application of a constitutional mechanic's lien for "articles made" is restricted to articles made pursuant to special order in conformity with the ultimate purchaser's instructions. The Court will address each of these issues.

In the Parsons and Kellogg cases, a considerable dispute exists over who is the actual owner of the vessels. Both Parsons and Kellogg claim they are the owners of the vessels. South Coast maintains that Debtor is the owner of the vessels. Despite making some earlier claims as owner to these vessels, Debtor's position at the hearing was noncommittal. As acknowledged by the parties, this is a threshold issue because a constitutional mechanic's lien can arise only between parties in privity with one another.

*Robert Burns Concrete Contractors v. Norman,* 561 S.W.2d 614, 617 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.) ([The constitution] fixes a [mechanic's] lien on property in favor of the principal contractor against the owner, but does not extend to and give other persons a lien who have no privity of contract with the owner, even though they may have furnished material to the principal contractor). If the Court were to find that Parsons and Kellogg are actually the owners of the vessels in which they claim an interest then only Debtor, in the capacity of a contractor, would be in privity with these parties. For its part, South Coast would be in the disadvantageous position of being a subcontractor to Debtor. *Da–Col Paint Mfg. Co. v. American Indemnity Co.,* 517 S.W.2d 270, 273 (Tex.1974) (Whether one is considered an original contractor or a subcontractor is of fundamental importance. A subcontractor does not have a constitutional lien.).

■ The basis of Parsons' ownership claim to the vessel which it had commissioned Debtor to build rests on paragraph 28 of its agreement with Debtor which provides as follows:

> Title to all material purchased or otherwise acquired hereunder by the SELLER to effect performance under the Purchase Order will vest in the BUYER upon payment for or acceptance of such materials by BUYER.

Parsons also relies on a letter dated December 16, 1992, between Parsons and Debtor by which Debtor purported to transfer to Parsons all of its right, title and interest in the vessel. For a number of reasons, the Court is not convinced that this evidence establishes that Parsons is the owner of the vessel. First, the Court questions Parsons' reliance on the vesting of title provision in its contract when the plain terms of the December 16, 1992, letter states that title to the vessel did not transfer until that time. If anything, the December 16, 1992, letter seems to suggest that at that time Debtor was not of the impression that title had previously passed between the parties. Second, the Court is not convinced that these documents alone are sufficient to transfer title in this type of property. Third, while Parsons paid Debtor

over the months preceding Debtor's filing for relief substantial progress payments amounting to several hundred thousand dollars, the Court cannot conclude that these payments were related to the materials furnished by South Coast. Parsons' representative testified that one of its payments was made to compensate Debtor for "drawings" of the vessel and the second payment was for the provision of certain "head and plate" material. There is no unqualified indication that Parsons envisioned the application of its second payment to the assorted nozzles and flanges provided by South Coast. Similarly, the documentary evidence introduced by Kellogg is even less supportive of Kellogg's position that it is the owner of the vessels at issue in its adversary proceeding. Accordingly, weighing the evidence, the Court finds that in the case of Parsons, Kellogg and all of the remaining vessels at issue the evidence supports this Court's conclusion that Debtor was the owner of all of the vessels at the time the orders of sequestration were issued.

■ Debtor, Parsons, and Kellogg additionally argue that South Coast, as a non-manufacturing supplier of components is not entitled to assert a constitutional mechanic's lien. This assertion is buttressed by the undisputed fact that FVC is the actual manufacturer of the majority of components supplied by South Coast which were the subject of the state court sequestration actions. Since in Texas, a sub-contractor or a materialman who supplies material to another materialman, the latter of which is in privity of contract with an owner, is not entitled to assert a constitutional mechanic's lien, the Court understands the logic of this argument. However, an analysis along these grounds would be unduly simplistic.

The testimony of both South Coast and FVC confirms that their relationship was extremely symbiotic. As previously stated, South Coast was a non-manufacturing supplier of components used in the construction of vessels. If a customer desired a type of component which was normally kept in stock by South Coast, such component would be provided directly from South Coast and would be billed to the client on a South Coast invoice. However, if a customer desired an

item which was not normally kept in the inventory of South Coast in a premanufactured state, such customer could select the component as adjusted for design specifications from a FVC catalog maintained by South Coast. Such customer could also deal directly with FVC in ordering these non-stock items. If a customer's design specifications required the forging of a component not listed as being offered in FVC's catalog, FVC could generally design and forge such a component to meet a customer's specifications. However, whether the customer dealt with South Coast or directly with FVC, all billing and invoicing was done exclusively through South Coast.

█ The Court can understand the reluctance of Texas courts to extend the protection of constitutional mechanic's liens to subcontractors or material suppliers of qualifying materialmen to prevent the creation of multiple secret liens to the detriment of an owner and commerce in general. Such a policy, however, is not impugned by the facts of this case. The facts do not indicate that Debtor was ever invoiced directly from FVC. On the contrary, the Court is convinced that Debtor was well aware of the relationship between South Coast and FVC as it pertained to the manufacturing and billing of components made to order. At no time has Debtor controverted its liability for the invoices billed by South Coast. Prior to bankruptcy Debtor accepted the billing invoices from South Coast stemming from components shipped directly from FVC as valid. Debtor never challenged the authority of South Coast to invoice for components which were manufactured by FVC pursuant to direct instructions by Debtor to FVC which did not involve South Coast. In a sense, from Debtor's perspective, FVC and South Coast, to the extent of the provision of components made to order can be viewed as an integrated entity. Accordingly, the Court cannot find that the mere separate existence of FVC and South Coast is an impediment to the assertion by South Coast of a constitutional mechanic's lien.

█ The primary dispute among the parties concerns whether South Coast is the type of materialman entitled to the protec-tions of a constitutional mechanic's lien. This controversy surrounds the meaning of the term "article made." Even if a material-man is in direct privity with the party for whom the chattel is being made, a material-man is not entitled to a constitutional mechanic's lien on a chattel to secure the materialman for all material provided. The law in Texas is well settled that a "constitutional lien on manufactured chattels is available to the manufacturer only upon articles made especially for a purchaser pursuant to a special order and in accordance with the purchaser's plans or specifications." *First Nat'l Bank in Dallas v. Whirlpool Corp.,* 517 S.W.2d 262, 268 (Tex.1974) (Holding that a supplier of premanufactured electric refrigerators and ranges is not entitled to a constitutional mechanic's lien). The *Whirlpool* case is in harmony with other cases which have addressed this issue. In *Reeves v. York Engineering & Supply Co.,* 249 F. 513, 517–518 (5th Cir.1918), a decision cited in *Whirlpool,* the court concluded that a supplier of an ice machine, built and installed pursuant to a purchaser's specifications, was entitled to assert a constitutional mechanic's lien. In its holding, the court distinguished between situations in which the constitutional mechanic's lien would and would not apply:

> If the sale is in the course of business, and without reference to any particular improvement, no lien results, unless it is specifically retained. If, however, the material is sold with regard to the making of a certain improvement, no reason is seen why the constitutional rule should not apply. It is not always the case when gas fixtures are sold, or a cooking range is sold, or engines and boilers are sold, that a lien upon the property so sold, or upon any other property on which it is to be placed, results. But if the material is bought with the purpose of incorporating it into a building or improvements, the terms of the Constitution would seem to apply. The Constitution gives the lien to "materialmen of every class." The lien is given "upon the buildings and articles made or repaired." The language is broad and the purpose is clear. There is nothing to indicate that merely raw material is intended

to be included within its terms. Certainly, some classes of manufactured products would always be so included. For instance, no one would think of undertakings to maintain that nails and screws, locks, doors and windows were not within the terms of the Constitution. No reason is made sufficiently to appear why such machinery as was furnished in the instant case, capable of incorporation into and made a part of the plant and furnished for that purpose, should not be held to be included.

A second case, also cited by the *Whirlpool* court, similarly extended the protections of a constitutional mechanic's lien to the supplier of certain millwork built pursuant to a purchaser's specifications. *Huttig Sash & Door Co. v. Stitt,* 218 F. 1, 6 (5th Cir.1914); *compare Ball v. Davis,* 118 Tex. 534, 18 S.W.2d 1063, 1067 (1929) (The setting of casing in an oil well does not constitute an 'article made' for the purpose of a constitutional mechanic's lien).

The main objection to South Coast's treatment as a mechanic's lien claimant is premised on the argument that FVC maintains a catalog with South Coast which lists the types of components which can be manufactured by FVC. This FVC catalog also provides that a customer's design specification which requires nonstandard size or temperature resistance factors can be accommodated through the forging process. There is no dispute that the components supplied to Parsons were built according to drawings and design specifications supplied by Parsons. Aside from the Parsons' project Debtor maintains that because these components can be ordered through a catalog that such components are not the types of chattels which fall within the purview of a constitutional mechanic's lien. The Court cannot agree. By its very terms, the test employed by the *Whirlpool* court is fully applicable in this case. With the exception of a relatively small amount of components which were demonstrated to have come from South Coast's preexisting inventory, it is abundantly clear that the components were made especially for Debtor pursuant to special orders and in accordance with the Debtor's plans or specifications. Based on the usage of the

vessels, Debtor's customers required a variety of differently sized components in addition to the use of non-standard alloys to give the components certain temperature resistant qualities. It is undisputed that the vast majority of these components were not maintained in the stock of either South Coast or FVC in the normal course of business. The testimony is clear that on the basis of these orders FVC was required to select raw materials and actually forge these components. The Court is convinced that but for Debtor's ordering of these special quality components, these components would not have come into existence but would have remained raw material. This is substantially different from the *Whirlpool* case in which the supplier did not actually build the refrigerators and ranges to accommodate the ultimate purchaser. As long as a mechanic's lien claimant manufactures a nonstandard chattel for a purchaser solely as a result of that purchaser's instructions such manufacturer will be entitled to claim a constitutional mechanic's lien; one does not need to reinvent the wheel. Furthermore, the Court finds as untenable Debtor's position that South Coast's or FVC's clearly financial decision not to stock every item listed in its catalog to be of any relevance to this analysis. The testimony of both South Coast and FVC is unequivocally clear—such a decision would not be financially feasible.

A final point which this Court wishes to address concerns the contentions of Parsons and Kellogg that South Coast's failure to demonstrate affirmatively that the components were actually installed on the vessels at issue forecloses South Coast's present claim. This Court disagrees. The Court finds that South Coast has amply made a prima facie case that the components at issue were installed on the vessels for which they were built. South Coast's invoices clearly identify each of the components provided and to which vessel (identified by purchase order number) it was to be installed. Debtor's representative testified that to the best of his knowledge the components were so installed. While such evidence is not necessarily conclusive of whether the components were actually installed, it certainly establishes South

Coast's prima facie case on this issue. Neither Parsons or Kellogg could offer any evidence to rebut South Coast's contentions. In accordance with this Court's findings and based on an analysis of the testimony and the evidence introduced, the Court finds that South Coast is entitled to a constitutional mechanic's lien on the following vessels in the following amounts:

| DESCRIPTION [6] | SPECIAL [7] | NONSPECIAL [8] | TOTAL |
|---|---|---|---|
| P.O. # 5745 special nozzles made to drawing; made of low-temp material Parsons | 207,980 | –0– | 207,980 |
| P.O. # 6395 special nozzles low-temp LF2 material Howe–Baker Engineers | 8,780.50 | –0– | 8,780.50 |
| P.O. # 6634 high temp F11 material Howe–Baker Engineers | 29,445 | –0– | 29,445 |
| P.O. # 6810 low neck weld size and length variations Howe–Baker | 12,878.85 | 165.40 | 13,044.25 |
| P.O. # 6660 stainless 347 well fittings Howe–Baker | 4,112.42 | –0– | 4,112.42 |
| P.O. # 6806 special Q stub nozzles made per drawing Hunt Oil Co. | 12,537 | –0– | 12,537 |
| P.O. 6733 mostly standard special long neck weld (length) Litwin (Total Petroleum) | 446 | 2,999.62 | 3,455.62 |
| P.O. 6734 special A182F11 material some special lengths of nozzles Litwin | 4,731.65 | –0– | 4,731.65 |
| P.O. 6811 standard material blank rough forgings odd long neck welds Badger/Koch | 1,425 | 6,064.37 | 7,489.37 |
| P.O. 6747 special forgings per drawings remainder consists of standard material Dow Chemical | 11,505 | 4,544.86 | 16,049.86 |
| P.O. 6748 special forgings per drawings remainder consists of standard material Dow Chemical | 11,505 | 4,544.86 | 16,049.86 |
| P.O. 6697 special material long length nozzle Kellogg | 1,189 | –0– | 1,189 |
| P.O. 6470 special type 304L stainless steel flanges unusual length nozzle Kellogg | 2,928.90 | –0– | 2,928.90 |
| P.O. 6565 standard materials Kellogg | –0– | 5,949.61 | 5,949.61 |
| P.O. 6698 standard materials Kellogg | –0– | 276 | 276 |
| TOTAL | Constitutional Lien | $24,544.72 | $334,009.04 |

---

The last issue before the Court concerns the question of the lien priority between Orange Bank and South Coast. As previously stated, Orange Bank holds a valid perfected security interest in the accounts receivable, work in process, and inventory of the Debtor. It is undisputed that this security interest was perfected prior to any point on which South Coast's constitutional mechanic's

6. Each individual notation identifies a specific vessel (through purchaser and Debtor's purchase order number) and contains a brief description of the nonstandard aspect of the order.

7. 'Special' identifies the dollar amount of non-standard components supplied.

8. 'Nonspecial' identifies the dollar amount of stock items supplied.

lien could have vested. At all times relevant to this proceeding, the outstanding balance on Orange Bank's loans to South Coast totaled approximately 1.5 million dollars. While there is not a serious dispute about the validity of Orange Bank's security interest in any of the items claimed by South Coast pursuant to its constitutional mechanic's lien, there is a considerable dispute between the parties as to the relative priorities among these liens.

Even though South Coast failed to protect itself through the perfection of a security interest in the components supplied South Coast nonetheless argues the applicability of three statutes i.e. Tex.Bus. & Com. Code Ann. §§ 9.310, 9.314, and 9.315 (Vernon 1991 & Supp.1993). The latter two statutes dealing with the priority right of a holder of a security interest in accessions or goods which have lost their identity through the manufacturing process are inapplicable in this case for no other reason than that South Coast has failed to perfect a proper security interest in the components supplied. However, the remaining statute cited deserves comment.

Section 9.310 provides as follows:

When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

Seizing on language in the official comment to this section which states that this section is intended to grant priority over preexisting security interests to providers of materials or services which "enhance or preserve the value of the collateral" South Coast argues that as a holder of a mechanic's lien it should take priority over Orange Bank's preexisting perfected security interest. § 9.310 comment 2; *see Gulf Coast State Bank v. Nelms*, 525 S.W.2d 866, 869–870 (Tex.1975) (An automobile mechanic's lien on an automobile in his possession to secure services rendered takes priority over a prior secured party with a security interest in the automobile).

While an attractive proposition, South Coast's claim to priority must fail. Explicit in § 9.310 and implicit in the *Nelms* decision is the requirement that the mechanic's lien claimant retain possession of the goods. Subsequent to delivery to Debtor, South Coast has at no time had possession of either the components supplied or the vessels into which the components were installed. Presumably, South Coast is relying on the sequestration orders to satisfy the requirement of possession. However, as ably pointed out by Orange Bank, in cases of sequestration, the sequestering court obtains possession of the goods *in custodia legis*. Because South Coast cannot meet the possession requirement its reliance on § 9.310 is misplaced. Although no statutory or case authority is dispositive of this issue the Court finds the methodology used by Texas courts in resolving priority disputes between statutory mechanic's lien claimants and preexisting security interests to be useful.

With regard to a statutory mechanic's lien, the law in Texas is well settled that a mechanic's and materialman's statutory lien is superior to a prior recorded deed of trust lien where the improvements can be removed without material injury to the land or preexisting improvements. However, the opposite result is mandated if the removal would cause material damage to the land or preexisting improvements. *Whirlpool*, 517 S.W.2d at 269. The Court finds that such a rule of law to be sufficiently analogous to be applied to this case. Despite this Court's finding that South Coast has a valid constitutional mechanic's lien on the majority of the components it has supplied Debtor, the testimony is undisputed that removal of these components would destroy the integrity of the vessels themselves. In real terms, such a removal would reduce the value of any given vessel from hundreds of thousands of dollars to the price of scrap metal. Because South Coast cannot assert its constitutional mechanic's lien and recover its components without destroying the integrity of the vessels themselves, the Court must find that South Coast's constitutional mechanic's lien

is subordinate to the lien granted in favor of Orange Bank.[9]

Finally, since the Court finds that the parties have failed to demonstrate that South Coast's sequestration of the various vessels at issue was wrongful no damages will be awarded.

9. Whether this holding renders South Coast's mechanic's lien unsecured and hence subject to avoidance is not before the Court.