**In re TELIGENT, INC., Debtors.**

**Savage & Associates, P.C. as the Unsecured Claim Estate Representative, Plaintiff,**

v.

**Level(3) Communications, Defendant.**

**Bankruptcy No. 01–12974 (SMB).**

**Adversary Pro. No. 03–03695.**

United States Bankruptcy Court, S.D. New York.

Oct. 12, 2004.

Savage & Associates, P.C., Denise L. Savage, Michael K. Gertzer, of Counsel, White Plains, NY, for Plaintiff.

Winston & Strawn LLP, David Neier, Piero A. Tozzi, Sarah L. Trum, of Counsel, New York, NY, for Defendant.

## POST–HEARING FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING "NEW VALUE" DEFENSE

STUART M. BERNSTEIN, Chief Judge.

Section 547(c)(4) permits a defendant in a preference action to offset his liability to the extent he gave "new value" to the debtor after the preferential transfer. The principal issue in this case is whether the defendant, Level (3) Communications ("Level–3"), proved its "new value" defense at trial simply by offering into evidence the invoices pertaining to the "new value" services without additional proof that the services were actually provided. For the reasons that follow, I conclude that Level–3 failed to sustain its burden of proof.

## BACKGROUND

### A. Introduction

At all relevant times, the affiliated debtors (collectively, "Teligent") were engaged in the telecommunications business. Level–3 provided a variety of telecommunications services to Teligent, including "colocation," "dark fiber," and "wavelength." Generally, colocation refers to the placement of a competing local phone company's equipment on property owned or controlled by an incumbent local exchange carrier. *See* HARRY NEWTON, NEWTON's TELECOM DICTIONARY 187 (19th ed. 2003)("NEWTON"). In this case, Teligent placed its equipment on property owned or controlled by Level–3. (Trial Transcript ("Tr.") at 128). "Dark fiber" refers to optical fiber within a cable that lacks the electronic capability to transmit information; "[t]he customer is expected to put his own electronics and photonics on the fiber and thus be able to make transmissions." NEWTON 468. In contrast, "wavelength"

refers to "lit" fiber, (Tr. at 51), or optical fiber that already has the necessary electronic or photonic equipment installed, and can carry transmissions. *See* NEWTON 468.

Level–3 billed Teligent for these services using different accounts. For example, Account no. 782 covered colocation and wavelength, and Account no. 24647 related to dark fiber. (*See* Plaintiff's Exhibit ("PX") A.) Although the record is not crystal clear, it appears that the specific services, other than colocation, appearing on the invoices pertaining to Account no. 782—*i.e.*, private line, metro access, voice and customer provided access, or CPA—related to the wavelength service.

The plaintiff, appointed the Estate Representative under Teligent's confirmed plan, commenced this preference action against Level–3. The Complaint alleged that Teligent transferred $2,527,952.93 to Level–3 during the ninety-day preference period, but the parties now agree that the actual transfers consisted of two checks, one dated February 28, 2001, in the sum of $259,068.95, and the other dated April 10, 2001, in the sum of $159,197.74. In addition, the parties agree that Level–3 received the second transfer on April 17, 2001, for purposes of calculating "new value" under 11 U.S.C. § 547(c)(4).

Prior to trial, Level–3 moved for summary judgment on its "new value" defense. I denied the motion but separated the issue for immediate trial. *See* FED. R.CIV.P. 42(b) (made applicable by FED. R. BANKR.P. 7042). I assumed for the purpose of the trial that the plaintiff had satisfied the elements of a preference under 11 U.S.C. § 547(b) as to each payment, and tried the "new value" defense on June 23, 2004.

## B. Level–3's Direct Case

Level–3's only witness at trial was Tara Pilkington, a Level–3 collections supervi-sor. She testified that Level–3 generally billed Teligent for its services in advance. The principal exception concerned new services that started during a particular month, and were billed in arrears, for the partial month, on the next month's bill. (*See* Tr. at 23–24.) According to Pilkington, Level–3's services were provided pursuant to the parties' agreement entitled "Terms and Conditions for Delivery of Service," signed in May 1999 (the "1999 Agreement"). (Defendant's Exhibit ("DX") 1.)

Level–3 sought to prove its "new value" defense by offering the relevant invoices into evidence, and focused on the services rendered after April 17, 2001, the date that it received Teligent's second transfer. According to the April 2001 bill corresponding to Account no. 782 (DX 4), Level–3 charged Teligent $11,637,624.21 for the services to be rendered in April plus any new services commenced during March. The April bill also showed that Teligent paid $259,068.95 during March, corresponding to the first transfer. The May 1 bill, (DX 6), included new charges in the amount of $446,641.65. It also indicated that Teligent paid $159,197.74 in April—the amount of the second transfer—and also received a credit in the amount of $4 million. The total charges and payments (or credits) were summarized, in each case, on the first page of the bill.

The aggregate monthly bill represented the sum of hundreds of individual charges, often small in amount. Each bill ran approximately sixty pages, and each page (after the first) contained several separate charges. For example, the second page of the April bill identified three colocation charges, two in the sum of $450.00, and one in the sum of $700.00. Each charge corresponded to a specific location where Teligent located its equipment on Level–3's property. The next page identified

three charges, each in the sum of $50.00. The information included with these charges indicated that each charge covered the then-current month. In other words, these colocation charges referred to services to be rendered in April.

Some of the charges in the April and May bills covered past rather than future services. As indicated, if Level-3 began providing a service during March, the March bill would not have included a charge for that service. Instead, the charge for the March usage (in addition to an installation charge) first appeared in the April bill together with a separate charge for the prospective April usage. Examples appear on page forty-five of the April bill. Finally, the April bill included some substantial charges that corresponded to a one-time 40% down payment for IRUs.[1] (Tr. at 52.)

In presenting its "new value" defense, Level-3 concentrated on the charges incurred for services rendered after April 17, 2001 and up through the May 21, 2001 petition date. Since the April bill included charges for services before April 18, 2001, and the May bill included post-petition charges, the monthly charges had to be prorated. Using an Excel spreadsheet formula, Pilkington essentially went through each line item in both bills, divided each prospective charge by thirty and

then multiplied the result by the number of "eligible" "new value" days during that month. In the case of the April bill, Pilkington multiplied the result by thirteen (April 18–30), and she multiplied the May result by twenty (May 1–20). (See Tr. at 37–41.) She ignored the IRU charges and past usage charges in performing her analysis. (Tr. at 69–70.)

Pilkington set forth this analysis in two proration charts, one covering April, (DX 5), and the other covering May. (DX 7.) Her testimony and the charts suggested that between April 18 and April 30, Level-3 provided services with a value of $183,568.04. (Tr. at 38–39; DX 5.) In May, Level-3 allocated $293,448.11 to the services provided through the petition date. (Tr. at 41; DX 7.) The total "new value" charges of $477,016.15 exceeded the preference claim ($418,266.69), indicating that Level-3 enjoyed a complete defense.[2] Finally, Pilkington testified that she was not aware of any disputes connected with the bills. (Tr. at 55.)

Although Pilkington credibly identified the bills and testified that they were sent to Teligent, she lacked personal knowledge about the underlying services. She stated at several points during cross-examination that she did not know what the new charges related to, (Tr. at 59–60), or

---

1. IRU refers to "Indefeasible Right to Use," a term that generally connotes the right to use a circuit or line for a specific time and bandwidth. NEWTON 431–32. Page 53 of the April bill included several of these types of charges.

2. The plaintiff objected to Level-3's reference to the proration charts in the post-trial submissions because the charts were not received in evidence. The information in the proration charts was culled from the April and May bills which were received in evidence. The charts were, therefore, pedagogical devices that organized the evidence. They may be used although not admitted into evidence, and since this was a bench trial, there should be no

concern about confusion or the need for a limiting instruction. See generally 6 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 1006.08[4], at 1006–23 to 1006–27 (2d ed.2004). Besides, I could develop the same information by doing precisely what Pilkington did-go line by line through 120 pages of bills, disregard the past usage and IRU charges and prorate the prospective charges. Although the plaintiff disputed the theory that the bills, without more, proved that the services were actually rendered, she failed to show that the charts did not accurately prorate the bills according to the methodology that Pilkington described.

whether the services billed in advance were actually provided. (Tr. at 60, 62, 99, 103.)

Pilkington was Level–3's only witness, and at the conclusion of the direct case, the plaintiff moved for judgment on partial findings pursuant to FED.R.CIV.P. 52(c)(made applicable by FED. R. BANKR.P. 7052). (*See* Tr. at 110.) The motion was denied, primarily on the premise that the bills were *prima facie* evidence that the services identified within them were actually provided, and the proration approach was an appropriate method of allocating the value of the services. (*Id.* at 110–11.)

## C. The Plaintiff's Rebuttal Case

The plaintiff's rebuttal case tended to undercut Pilkington's testimony. In particular, the plaintiff adduced evidence of substantial disputes regarding the wavelength services, and contained what appeared to be express acknowledgments by Level–3 that Teligent owed much less than the amount Level–3 claimed in its bills and this adversary proceeding.

### 1. The Governing Agreements

Pilkington implied, on direct, that the 1999 Agreement regulated the rights of the parties. She had referred to it in the course of her duties (*id.* at 28–30), and she was not aware of any other agreements governing the services provided to Teligent by Level–3. (*Id.* at 57.)

The relevance of the 1999 Agreement was questionable. On or about May 2000, Teligent and Level–3 entered into more comprehensive agreements (collectively, the "2000 Agreements"). These included an Integrated Partner Agreement (PX E1), a wavelength agreement (PX E2), and agreements covering "metro dark fiber" (PX E3), national wavelength service (PX E4), and colocation. (PX E5.) When Level–3 sent a Notice of Default to Teligent on

or about April 19, 2001 (PX A), it referred to the 2000 Agreements, as amended, and did not mention the 1999 Agreement.

### 2. The Disputes

While Pilkington testified that she was not aware of any disputes regarding Level–3's services, the plaintiff offered evidence of substantial disputes regarding the use of Level–3's "Rings." Teligent licensed the use of seven Rings from Level–3. A Ring is a large circle of optical fiber that runs throughout various cities and allows telecommunications traffic to move across it between those cities. (Tr. at 130–31.) Ring 1 began and ended in Boston, and generally serviced the Northeast. Ring 2 began and ended in Washington, D.C., and generally serviced parts of the Southeast and Midwest. Ring 3 began and ended in Atlanta, and generally serviced Florida, parts of Texas and Tennessee. Rings 4, 5 and 6 also serviced some of these same areas (other than Florida, Washington, D.C. or the Northeast), and Ring 7 (as well as Ring 6) serviced the West. (*See* PX E4, at App. "A.")

Level–3 was obligated to perform "Acceptance Testing" to confirm the capacity of each Ring. Teligent and Level–3 contracted to use their best efforts to agree on the test criteria. Once Level–3 advised Teligent by written notice (the "Completion Notice") that a ring met "Acceptance Testing," Teligent had twenty days to send a written rejection of the Completion Notice. The rejection had to specify the material failure of the capacity. If Teligent sent a timely rejection, Level–3 was obligated to promptly take steps to remedy the failure identified in the rejection. If Teligent failed to reject the Completion Notice, or used the Ring under certain circumstances other than testing, it was deemed to have accepted the Ring. (*See* PX E4, at Art. 5.)

On April 13, 2001, Brian Leventhal, a Teligent Senior Corporate Counsel, wrote to Level–3 objecting to the Completion Notices issued in connection with Rings 1, 2 and 3. (PX B.) The letter specified three reasons. First, Level–3 failed to use its best efforts to agree on testing standards with Teligent. According to the letter, Level–3 ignored Teligent's requests, and failed to propose standards. Second, Level–3 failed to demonstrate that the three Rings were complete and fully operational. The letter pointed out that cabinets [3] were unavailable in certain cities, prohibiting full and complete Acceptance Testing. Third, Teligent was unable to connect its central offices, through "lateral builds," to Level–3's gateways in three cities because Level–3 had not obtained final price quotes for the builds.

The rejection had a direct bearing on the charges at issue. The April and May bills included numerous charges for colocation and the use of wavelength in the Northeast, Washington, D.C. and Florida. (See, e.g., DX 4, at pp. 16–24, 36–39, 41–43, 54–57; DX 6, at pp. 16–18, 20–23, 36–41, 50–54.) These areas seem to have been part of the circuits comprising the disputed Rings. In addition, the bills included charges relating to cities in Texas as well as Chicago that were part of the circuits covered by two Rings, one of which was the subject of a rejection.

Level–3's own records reflected the magnitude of the dispute, and its effect on Teligent's debt. According to the Level–3 telephone logs, Teligent protested $303,000.00 in charges on the April 1 bill relating to circuits that had not been accepted. (PX D (entry dated 4/4/2001).) Subsequent entries indicated that Teligent only owed $149,000.00. (Id. (entries dated 4/30/2001, 5/1/2001).)

The Ring disputes led to internal confusion at Level–3 and inconsistent billing. On April 19, 2001, Level–3's vice president and general counsel, John M. Ryan, sent a Notice of Default to Teligent stating that Teligent owed $17,444,484.53. (PX A.) The charges consisted of the amount billed on April 1 under Account no. 782 minus the March payment ($11,632,412.94), plus the amounts due in connection with the dark fiber account ($5,772,987.43) and an account identified in the Notice of Default as "O & M" ($39,084.16). On May 1, Level–3 sent a bill on Account no. 782 indicating total charges (i.e., new and old) in the sum of $8,079,054.59. (DX 6.) This amount reflected the $4 million credit [4] and the April payment.

One day later, however, on May 2, 2001, Level–3's collection department sent a letter to Teligent stating that the amount "past due" and "due and payable immediately" was only $149,005.60. (PX F.)

On May 19, 2001, Ryan sent a Notice of Termination to Teligent. (PX C.) The Notice referred to the April 19, 2001 Notice of Default, and terminated the parties' agreement based on Teligent's failure "to timely cure the defaults referenced therein." It did not refer to the May 2nd letter that advised Teligent that it only owed slightly more than $149,000.00, or the $4 million credit that appeared in the May bill.[5]

---

3. A "cabinet" refers to a container that encloses various telecommunications equipment. NEWTON 134.

4. The plaintiff took issue with the application of the credit. In light of the Court's determination, it is unnecessary to address the points that she raised.

5. The record reflected other disputes bearing on prospective charges. For example, Level–3 refused to honor Teligent's requests to disconnect certain services. (PX M, N.) In addition, Level–3 refused to provide private line service until the bills for dark fiber service were paid. (PX S.) Teligent, on the other hand, contended that it was being over-

## DISCUSSION

### A. The "New Value" Defense

■ A transferee, may, under § 547(c)(4)[6], offset a preferential transfer to the extent he gave the debtor "new value" *after* the date of the transfer, and the "new value" remains unpaid. *Charisma Inv. Co. v. Airport Sys., Inc. (In re Jet Florida Sys., Inc.)*, 841 F.2d 1082, 1083 (11th Cir.1988); 5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 547.04[4][c], at 547–68.4 (15th ed. rev. 2004). "New value" means, *inter alia*, "money or money's worth in goods, services, or credit, ... but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2).

■ The "new value" exception encourages creditors to deal with troubled businesses, *Southern Tech. College, Inc. v. Hood*, 89 F.3d 1381, 1384 (8th Cir.1996)(quoting *Kroh Bros. Dev. Co. v. Continental Construction Engineers, Inc. (In re Kroh Bros. Dev. Co.)*, 930 F.2d 648, 651 (8th Cir.1991)); *In re Jet Florida Sys., Inc.*, 841 F.2d at 1083; *see Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir.1994), and promotes equality of treatment among creditors. *In re Jet Florida Sys., Inc.*, 841 F.2d at 1083–84. It recognizes that the "new value" effectively repays the earlier preference, and offsets the harm to the debtor's other creditors. *See In re Toyota of Jefferson, Inc.*, 14 F.3d at 1091; *In re Kroh Bros. Dev. Co.*, 930 F.2d at 652; *In re Jet Florida Sys., Inc.*, 841 F.2d at 1084. Accordingly, "the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate." *In re Kroh Bros. Dev. Co.*, 930 F.2d at 652; *accord Southern Tech. College, Inc. v. Hood*, 89 F.3d at 1384; *In re Toyota of Jefferson, Inc.*, 14 F.3d at 1091–92.

### B. Motion For Judgment On Partial Findings

■■ At trial, Level–3 had the burden of proving the "new value" defense by a preponderance of the evidence. *See* 11 U.S.C. § 547(g); *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 348 (Bankr. S.D.N.Y.1999). In a non-jury trial, if a party with the burden of proving a claim or defense fails to establish his *prima facie* claim or defense during his direct case, the court may enter judgment against the party pursuant to FED.R.CIV.P. 52(c).[7] After

charged for the dark fiber. (Tr. at 130.) These disputes were documented in internal e-mails, and e-mails between the parties, and were received in evidence. Level–3 argued in its post-trial submissions that the contents of the e-mails were not admissible because someone with personal knowledge of the contents did not testify at trial. Level–3 did not, however, object to the evidence at trial, and the e-mails were admitted without any such limitation.

6. Section 547(c)(4) states:
(c)The trustee may not avoid under this section a transfer
....
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

7. Rule 52(c) states:
If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of

Level–3 completed its direct case, the plaintiff moved for a "directed verdict," but I denied the motion. In retrospect, I should have granted it.[8]

The plaintiff's motion raised the following issue: did the April and May invoices, coupled with Pilkington's testimony, constitute *prima facie* evidence of the delivery and value of the services listed in the invoices? The few cases that have dealt with the probative value of invoices in the "new value" context have reached inconsistent results. For example, in *Scherling v. Albemarle Spinning Mills (In re Princeton Indus., Inc.)*, 39 B.R. 143 (Bankr. S.D.N.Y.1984), the defendant moved for summary judgment on its "new value" defense. The defendant relied on invoices to prove the "new value" shipments, and the trustee countered that the debtor's files did not indicate that the "new value" shipments were ever received. The court concluded that there was a material issue of fact, and denied the motion, implying that the invoices constituted evidence of shipment. *See id.* at 145; *accord In re Trans–End Tech., Inc.*, 228 B.R. 181, 186–87 (Bankr.N.D.Ohio 1998)(defendant established "new value" defense, justifying summary judgment, through invoices and affidavit of manager of collections).

Conversely, other courts have ruled that invoices were insufficient to prove the delivery of "new value". *See, e.g., TWA Inc.*

Post Confirmation Estate v. City & County of San Francisco Airports Comm'n (In re TWA Inc. Post Confirmation Estate)*, 305 B.R. 221, 228 (Bankr.D.Del.2004)(rejecting "new value" defense that was supported by spreadsheet of invoices but lacked any meaningful analysis of the information); *Grigsby v. Cardone Indus., Inc. (In re Apex Auto. Warehouse, L.P.)*, No. 96 B 04594, 2000 WL 640780, at *9–10 (Bankr.N.D.Ill. May 17, 2000)(denying defendant's motion for summary judgment on its "new value" defense because affidavit of its credit manager, explaining spreadsheet of invoices and payments, did not prove conclusively that the debtor had received the goods); *Official Committee of Unsecured Creditors of R.M.L., Inc. v. Sabrina S.P.A. (In re R.M.L., Inc.)*, 195 B.R. 602, 616–17 (Bankr.M.D.Pa.1996)(invoices failed to establish "new value" defense at trial absent proof of shipment or that merchandise was provided to the debtor after the date of the preferential transfer).

■ The foregoing cases concerned situations in which the defendant billed for the goods or services in arrears. While an invoice covering past services may provide evidence that the services were actually delivered as set forth in the invoice, *see Irving Trust Co. v. Commercial Factors Corp. (In re Nathan & Cohen Co.)*, 68 F.2d

---

fact and conclusions of law as required by subdivision (a) of this rule.

Rule 52(c) became effective in 1991. Prior to then, a party could obtain the same relief through a motion for a directed verdict under former Rule 41(b).

**8.** The denial of the plaintiff's motion represented a "tentative and inconclusive ruling on the quantum of [Level–3's] proof," and did not preclude me from making findings at the end of the case that varied from my prior tentative ruling. *See Armour Research Found. v. Chicago, Rock Island & Pac. R.R. Co.*, 311 F.2d 493, 494 (7th Cir.), *cert. denied*, 372 U.S.

966, 83 S.Ct. 1091, 10 L.Ed.2d 129 (1963); *accord Sanders v. General Servs. Admin.*, 707 F.2d 969, 972 (7th Cir.1983); *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185(AJP), 1999 WL 440775, at *19 (S.D.N.Y. June 28, 1999). Furthermore, I advised the parties after the close of the evidence that they could brief the evidentiary force of the invoices and accompanying testimony, (Tr. at 198–99), and after receiving their initial post-trial proceedings, I requested supplemental briefs on that specific issue. (*See* ECF Doc. # 43.)

864, 867 (2d Cir.1934)(invoices were sufficient proof of the delivery dates of goods in the absence of contradictory evidence), the same is not true of invoices covering future services. As noted earlier, the relevant inquiry in "new value" litigation is whether the defendant "replenished" the debtor's estate, and hence, negated the prejudicial effect of the preference. This concept is reflected in the definition that limits "new value" to "money or money's worth in goods, services, or new credit." *See* 11 U.S.C. § 547(a)(2).

■ Since bills for future services precede the delivery of the services, they cannot logically show that the services were actually delivered. At most, they reflect an implied promise to deliver those services at a later date. A promise of future services is not "money or money's worth," and does not constitute "new value." *Cf. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 204, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)(discussing the "new value" exception to the absolute priority rule). In other words, the promise to deliver services at a future date does not "replenish" the estate; only the actual delivery of the services does.

■ Here, Level–3 sought to prove that it "replenished" Teligent's estate by providing uncompensated telecommunications services after the second preferential transfer. Its April and May invoices, without more (and Pilkington's testimony did not add anything on this score), did not show that it actually provided the services during the ensuing month. Since it did not offer any other evidence, it failed to establish a *prima facie* defense of "new value" under 11 U.S.C. § 547(c)(4).

Furthermore, the cases relied on by Level–3 to support the opposite conclusion are distinguishable. First, none involved invoices for prospective services. Second, with one exception, none involved "new value" disputes in which the defendant must show that he "replenished" the estate, *i.e.*, that the goods or services were actually delivered. *See Schwinn Plan Committee v. AFS Cycle & Co. (In re Schwinn Bicycle Co.)*, 205 B.R. 557, 568 (Bankr.N.D.Ill.1997). For example, *In re Russell Cave Co.*, 253 B.R. 815 (Bankr. E.D.Ky.2000) involved an objection to a proof of claim. The court concluded that the invoices for past services attached to the claim constituted *prima facie* evidence of the arrearages. *Id.* at 819. The case merely illustrates the rule, embodied in FED. R. BANKR. P. 3001(f), that a properly executed proof of claim "shall constitute *prima facie* evidence of the validity and amount of the claim." The present litigation did not involve a claim objection.

In *In re Weissman*, 37 F.2d 585 (D.Conn.1929), a creditor sought to reclaim goods from the trustee. The precise question involved the falsity of a financial statement that the bankrupt had delivered to Dun & Co. The report was based on invoices received from the bankrupt's suppliers. The invoices were admitted into evidence to prove the falsity of the financial report, and established the creditor's *prima facie* right to reclamation. *Id.* at 586.

*In re A & M Operating Co.*, 182 B.R. 986 (Bankr.E.D.Tex.1993), *aff'd in part & rev'd in part on other grounds*, 182 B.R. 997 (E.D.Tex.1995), *aff'd without op.*, 84 F.3d 433 (5th Cir.1996), involved a dispute among rival lienors. One of the claimants argued that it had installed certain components on the debtor's high pressure vessels. The court concluded that the claimant had established a *prima facie* case through the invoices, which identified what was installed on each vessel, coupled with the testimony of the debtor's representative who stated that to the best of his knowledge, the components were so installed. 182 B.R. at 994–95. In Level–3's

case, no one with personal knowledge testified that the services identified in the April and May bills were provided.

Level–3's reliance on *In re Apex Auto. Warehouse, L.P.*, 2000 WL 640780, is surprising. There, the defendant moved for summary judgment based on the "new value" defense. In support, the defendant offered the relevant invoices and two affidavits from its credit manager. The affiant recounted the payment and credit history between the parties, summarized the history in a spreadsheet, attested to the accuracy of the invoices, and stated that to the best of his knowledge, the defendant shipped and the debtors received the goods itemized in the invoices. *Id.* at *9. The Court denied the defendant's motion concluding that the defendant's proof did not show conclusively that the goods shipped to the debtor reached the debtor. *Id.*

Here, Level–3's evidence was even weaker. Pilkington could not state, as the credit manager in *Apex* suggested, that the services depicted in the April and May invoices were actually provided. In fact, she testified that she did not know. Thus, although *Apex* involved a motion for summary judgment, its reasoning supports the conclusion that Level–3 failed to establish a *prima facie* "new value" defense during its direct case.

■ Similarly, Level–3's reliance on decisions involving an "account stated," [9] a common law action to recover a debt, misses the mark. To recover under a theory of an "account stated," the plaintiff must show that the defendant received and retained the plaintiff's invoices, and failed to object within a reasonable time or made a partial payment. *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir.1999); *In re Rockefeller Center Properties*, No. 00 Civ. 647(LAP), 2002 WL 22051, at *4 (S.D.N.Y. Jan.8, 2002); *Carey v. Mui–Hin Lau*, 140 F.Supp.2d 291, 298 (S.D.N.Y.2001); *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714, 721 (S.D.N.Y. 1986). The law, in those circumstances, implies an agreement to pay. *See id.*

The rationale employed in the "account stated" cases does not apply in the present case. First, Teligent did not fail to object to the invoices within a reasonable time. According to the 1999 Agreement—the only agreement that Level–3 identified during its direct case—Teligent had sixty days to dispute a bill. (DX 1, at § 2.5.) The April and May invoices were sent less than sixty days before Teligent filed its chapter 11 petitions. Once the bankruptcies were commenced, Teligent was not obligated or expected to object unless and until Level–3 filed a proof of claim relating to the debt. In fact, Level–3 conceded during the argument on its earlier summary judgment motion that it never filed a proof of claim.

Second, Teligent never made a partial payment. While Teligent paid earlier bills for other services, it never paid any portion of the April or May bills. Accordingly, the two cases cited by Level–3, *Allstate Power–Vac v. FCE Indus., Ltd.*, 282 A.D.2d 414, 722 N.Y.S.2d 401 (N.Y.App. Div.2001) and *Speciner v. Parr*, 252 A.D.2d

**9.** *See, e.g., Dynamic Microprocessor Assocs., Inc. v. EKD Computer Sales & Supplies Corp.,* No. 92 CV. 2787(FB), 1997 WL 231496 (E.D.N.Y. Apr.14, 1997); *Thaler & Gertler, LLP v. Weitzman,* 282 A.D.2d 522, 722 N.Y.S.2d 891 (N.Y.App.Div.2001); *Allstate Power–Vac v. FCE Indus., Ltd.,* 282 A.D.2d 414, 722 N.Y.S.2d 401 (N.Y.App.Div.2001); *Star Video Entm't, L.P. v. J & I Video Distrib., Inc.,* 268 A.D.2d 423, 702 N.Y.S.2d 91 (N.Y.App.Div.2000); *Speciner v. Parr,* 252 A.D.2d 554, 675 N.Y.S.2d 648 (N.Y.App.Div. 1998).

554, 675 N.Y.S.2d 648 (N.Y.App.Div.1998), are plainly distinguishable.

Level–3's "course of dealing" argument is also unconvincing. Level–3 offered evidence to show that Teligent paid two earlier bills, dated February 1, (DX 2), and March 1, 2001, (DX 3), and argued that the services in the April and May bills were the same. (*See Supplemental Memorandum of Law of Defendant Level(3) Communications In Further Support of Proposed Findings of Fact and Conclusions of Law,* dated Sept. 10, 2004, at ¶ 12.) Teligent's payment presumably proved that it actually received these services, implying that it also received (but did not pay for) the same services rendered between April 18th and the petition date.

Level–3 disproved the argument with its own documentary evidence. The new charges totaled $212,138.74 in the February bill and $159,197.74 in the March bill. The new charges in the April and May bills were exponentially larger. On April 1, Teligent billed $11,637,624.21 in new charges. (DX 4.) Even after subtracting the $4 million credit that appeared on the May invoice, the new charges in April still exceeded $7.6 million. On May 1, Teligent billed $446,641.65 in new charges. (DX 6.) Plainly, the April and May bills included charges for prospective services that Level–3 never billed or delivered in the prior months.

Furthermore, Level–3 failed to show that any of the services provided in February and March, and paid for by Teligent, were the same services provided in April and May. The proof was simple if not tedious. The February, March, April and May bills were received in evidence. (*See* DX 2, 3, 4, 6.) Level–3 could have analyzed the approximate 240 pages of bills and thousands of individual charges to identify recurring prospective charges that Teligent had paid in February and March. Level–3 did not bother to do so, and I see no reason why the Court should undertake the task if Level–3 did not think it worth the time.[10]

For all of the foregoing reasons, I conclude that Level–3 failed to make out a *prima facie* case on the "new value" exception, and I should have entered a judgment pursuant to Fed.R.Civ.P. 52(c) dismissing the defense.

## C. The Preponderance of the Evidence

██ Even if Level–3 established a *prima facie* "new value" defense in its direct case, I conclude that it failed to prove its defense by a preponderance of the evidence. In her direct case, the plaintiff substantially undercut any probative weight that the invoices and Pilkington's testimony might have otherwise merited. As noted above, the plaintiff proved that there were substantial disputes regarding the acceptance of three of the seven Rings. In addition, the April and May bills indicated that many of the charges for colocation and wavelength appeared to relate to the localities serviced by the rejected Rings.

What's more, Level–3's own internal phone logs—and its May 2nd letter—confirmed the existence of disputes regarding the delivery of these services. Although the phone logs implied that the dispute was limited to the April bill, the evidence suggested that the disputes may have also affected the new charges billed in May.

---

10. This does not mean that I accept Level–3's underlying premise. Even if the same service appeared on all four bills, proof that Teligent received the service in February and March did not necessarily prove that it received the service in April and May. The two months of proven service do not establish a practice or course of dealing sufficient to make the leap that Level–3 asks.

First, and notwithstanding what has been said, some of the same disputed services probably appeared in the April and May bills. Second, the May 2nd letter was sent after the May bill, and under the terms of the 1999 Agreement, payment was due upon receipt.[11] (DX 1, at § 2.2.) Thus, the May 2nd demand arguably included all sums due under both disputed bills. Third, it is not possible to tell whether the approximate $149,000.00 that Level–3 claimed to be due pertained to the "new value" services. The debt may have represented past usage charges or down payments for IRUs. For that matter, since the account was not identified in the May 2nd letter, part or all of the $149,000.00 may have been attributable to dark fiber or "O & M" charges that were also irrelevant to the "new value" defense.

Level–3 added to the confusion by making wildly inconsistent demands for payment. In its April 19, 2001 Notice of Default, Level–3 insisted that Teligent pay $17,444,484.53. (PX A.) On May 1, Level–3 sent a bill on Account no. 782 indicating total charges (*i.e.*, new and old) in the sum of $8,079,054.59, reflecting the $4 million credit and the April payment. On May 2, 2001, Level–3 sent a letter to Teligent stating that the amount "past due" and "due and payable immediately" was only $149,005.60. On May 19, 2001, Level–3 sent the Notice of Termination that referred to the April 19, 2001 Notice of Default, and terminated the parties' agreement based on Teligent's failure "to timely cure the defaults referenced therein."

Inexplicably, the Notice of Termination ignored the May 2nd letter, or, for that matter, the $4 million credit that had appeared in the May bill. I use "inexplica-

ble" because Level–3 never attempted to explicate these inconsistencies.

In addition, the plaintiff proffered evidence of other "new value" service disputes that were intertwined with the disputed metro dark fiber bills. Although the dark fiber services were not included in the "new value" claim, the e-mails received in evidence indicated that Level–3 cited the non-payment as a basis for refusing to honor Teligent's request to disconnect services, (PX M, N), and possibly, to provide private line services. (*See* PX S.) Level–3 could not refuse to cancel or provide services at Teligent's request, and rely on the same services to bolster its "new value" defense.

The foregoing leads me to conclude that Level–3 failed to carry its burden of proving that it delivered new services after it received the April 17th transfer, or at a minimum, that it failed to prove the value of the services that it did deliver. For all of the reasons discussed above, judgment should be entered against Level–3 dismissing its "new value" defense. This opinion constitutes the Court's findings of fact and conclusions of law. The parties are directed to settle an appropriate order and contact chambers to arrange a conference to discuss further proceedings.

---

11. Under the parties' 2000 agreement, payment was due within thirty days of the date of the invoice. (PX E2, at § 21.01.)