**In re: MOLTECH POWER SYSTEMS, INC., n/k/a Battery Park Industries, Inc., Debtor**

**Moltech Power Systems, Inc., n/k/a Battery Park Industries, Inc., Plaintiff,**

**v.**

**Truelove & Maclean, Inc. Defendant.**

**Bankruptcy No. 01–00335.**

**Adversary No. 03–90049.**

United States Bankruptcy Court, N.D. Florida, Gainesville Division.

June 1, 2005.

W. Gregory Golson, Esq., Tampa, FL, for Plaintiff.

Noel R. Boeke, Esq., Tampa, FL, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LEWIS M. KILLIAN, JR., Bankruptcy Judge.

THIS MATTER is before the Court on cross-motions for summary judgment ("Motions") filed by both parties to this adversary proceeding. On May 16, 2003, the Plaintiff, Moltech Power Systems, Inc. ("MPS"), filed its Complaint to recover preference payments in the amount of $280,631.00 from the Defendant, Truelove & Maclean, Inc. ("T & M"), under 11 U.S.C. § 547, to which T & M raised the affirmative defense of new value found in § 547(c)(4). The Court has jurisdiction over this matter and this is a core proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(1). For the reasons set forth herein, MPS's motion will be granted, and T & M's motion will be denied.

### FACTS

T & M is a contract metal stamping manufacturer with two manufacturing divisions, a battery components group, which makes casings for batteries, and a deep drawn metal components group. T & M maintained a supplier relationship with MPS dating back to an original contract signed between T & M and Energizer Power Systems ("Energizer"), MPS's previous owner, on March 24, 1998, retroactive to January 1, 1998. This contract (the "Agreement") was a five-year, three party agreement between T & M, Thomas Strip Div. Of Hille Mueller Corp., who supplied primary raw material, and Energizer. MPS purchased Energizer in September 1999 and committed to continue the terms and conditions of the Agreement by signing an Addendum to the Agreement on March 13, 2000. T & M supplied nickel plated steel rechargeable battery cans and stampings to MPS for use in its rechargeable battery systems. T & M manufactured the parts to conform to MPS's designs and specifications and thus the parts were specially made goods that could not be sold to anyone but MPS.

MPS's payment terms under the Agreement were 1% net 15 days, net 30 days in U.S. dollars from the date of the invoice, which was the same as the date of shipment. Per the Agreement, MPS provided T & M a rolling monthly forecast, which would typically forecast the number of parts MPS would need during a time period three to six months in the future. Because of necessary lead times in ordering raw material and actual manufacture of the parts, this forecasting method ensured that T & M would be able to fill MPS's orders during the month in which MPS actually required the parts from T & M. A typical forecast provided T & M with a specified number of parts it was required to manufacture to be ready for delivery over a three month period. Lead times of up to twelve to sixteen weeks were required in order to procure the necessary raw materials for the parts. The number of parts MPS listed for the earliest month on the forecast was considered a firm number and was supported by a monthly Purchase Order which contained weekly release quantities. The number of parts MPS listed for the second month on the forecast was also considered firm if the parts contained nickel plated steel material components. Because of the unusually long lead time associated with procuring these components, MPS was required to pay for the nickel plated steel material for the second month's forecasts even if the forecast changed. The number of parts MPS forecasted for the third month and beyond were provided only for material planning and purchasing purposes.

MPS would then provide monthly Purchase Orders to T & M which acted as confirmation of the current month's requirements and provided T & M with MPS's desired weekly shipment schedule. MPS submitted a separate Purchase Order for each individual component it purchased from T & M. MPS continuously submitted changes to Purchase Orders in the weeks just prior to expected delivery dates in order to adjust their requirements in accordance with their production schedules and their own customer requirements. By the time T & M received a Purchase Order from MPS, the parts being confirmed in the Purchase Order were already well into production, if not completed, based on the previously made forecasts. MPS continued to provide forecasts to T & M for expected delivery during the preference period. MPS also provided confirmations through the submission of Purchase Orders and changes to Purchase Orders for parts to be shipped during the preference period. Accordingly, T & M continued to manufacture and complete production of parts MPS confirmed that it expected to take delivery of during the preference period. MPS never cancelled any of its prepetition Purchase Orders.

MPS filed its Chapter 11 bankruptcy petition on May 22, 2001. Within the ninety days prior to filing bankruptcy, MPS transferred to T & M, an unsecured creditor, payments totaling $358,418.55, which, after crediting the amount subject to the contemporaneous exchange defense and the amount for new value extended conceded by MPS, resulted in net preferential amounts of $280,631.00 (the "Net Preference Amount"). MPS filed the instant adversary proceeding, asserting that it should be allowed to recover this amount for the estate, but T & M argues that it should be allowed to retain the Net Preference Amount because it is also subject to T & M's affirmative defense of "new value"

as contemplated under 11 U.S.C. § 547(c)(4). The basis for T & M's affirmative defense is its claim that by manufacturing specialty goods for MPS, it provided new value, even though such goods were never shipped to MPS. T & M filed its Amended Motion for Summary Judgment on March 22, 2005 (Doc. 19). MPS filed its Motion for Summary Judgment on the same day (Doc. 20). Thus, the issue before the Court on summary judgment is whether or not T & M's manufacture of the specialty goods constitutes new value. Each party filed affidavits in support of its Motion, and the Court conducted a hearing on the Motions on April 7, 2005.

## DISCUSSION

■ The parties moved for summary judgement under Rule 56 of the Federal Rules of Civil Procedure, made applicable to bankruptcy adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure. The concept of summary judgment is based upon the principle that "if the court is made aware of the absence of genuine issues of material fact, the court should, upon motion, promptly adjudicate the legal questions which remain and terminate the case, thus avoiding the delay and expense associated with a trial." *Menotte v. Pulte (In re Martin)*, 278 B.R. 634, 639 (Bankr.S.D.Fla.2002)(citing *United States v. Feinstein*, 717 F.Supp. 1552 (S.D.Fla.1989)). A court is required to enter judgment for a moving party if the record reflects that there is no genuine issue of material fact to be resolved and that the moving party is entitled to judgment as a matter of law. *Id.*

Both MPS and T & M acknowledge that the Net Preference Amount constitutes a *prima facie* avoidable preference under § 547(b). Both parties also agree that the goods manufactured for MPS by T & M were specialty goods, and that the parts T

& M alleges constitute new value to MPS were never actually shipped to MPS. Because the parties agree as to the facts of this case, I find that there is no genuine issue of material fact to be resolved. Thus, the only remaining issue before the Court is the purely legal determination of whether or not the § 547(c)(4) affirmative defense of "subsequent advance" or "new value," applies to the Net Preference Amount.

■ In order for a creditor to prevail on the affirmative defense of new value under § 547(c)(4), it must show that it extended new value to the debtor after receiving the challenged payments, that the new value was unsecured, and that the new value remains unpaid. *Charisma Investment Co., N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d 1082, 1083 (11th Cir.1988) (citations omitted). The sole issue before the Court in the instant case is whether T & M's manufacture of the specialty products (without shipping them to MPS) constitutes an extension of "new value" as contemplated by § 547 of the Bankruptcy Code. If so, then the second and third elements of the new value defense would also be satisfied, as there has been no argument that the value was either secured or paid.

■ T & M argues that its manufacture of the specialty goods for MPS was sufficient to constitute new value under § 547(c)(4) even though these goods were never delivered to MPS. T & M bases its argument on Section 2–709 of the Uniform Commercial Code ("UCC") as adopted by Florida. *See* Fla. Stat. § 672.709 (2000). Section 2–709 of the UCC allows a seller to recover from a buyer the price of goods identified in a contract if the seller is unable to resell them at a reasonable price

or if any effort to sell them would be unavailing. Since the goods T & M produced for MPS from the forecasts MPS provided were specially manufactured goods, § 2–709 mandates MPS's liability for payment for the goods it ordered regardless of whether or not such goods were delivered. However, T & M's reliance on § 2–709 and the holding of *Royal Jones & Assocs., Inc. v. First Thermal Systems, Inc.*, 566 So.2d 853 (Fla. 1st DCA 1990)(applying Fla. Stat. § 672.709 in a specialty goods contract setting)as a basis for its affirmative defense is misplaced. While the UCC provision may establish a debt owed to T & M by MPS on the unshipped specialty goods, it does not establish new value as defined by § 547(a)(2) of the Bankruptcy Code.

■ "New value" for purposes of § 547 is defined in § 547(a)(2) as

money or money's worth in goods, services, or new credit, or release by a transferree of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

*Jet Florida System*, 841 F.2d at 1083. Courts applying this definition of new value have "consistently looked to the principal policy objectives underlying the preference provisions of the Bankruptcy Code." *Id.* The court in *Jet Florida* articulated two such policy objectives: first, to "encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse," and second, "to promote equality of treatment among creditors." [1]

---

1. T & M places emphasis on the first policy consideration over the second, citing

*Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d

*Id.* (citations omitted). The § 547(c)(4) exception to the avoidability of preferential transfers promotes these general policy objectives because its "utility is limited to the extent to which the estate was enhanced by the creditor's subsequent advances during the preference period." *Id.* at 1083–84. Thus, the defense of new value is available where the new value "effectively repays the earlier preference, and offsets the harm to the debtor's other creditors." *Savage & Assocs., P.C. v. Level(3) Communications (In re Teligent),* 315 B.R. 308, 315 (Bankr.S.D.N.Y.2004).

Courts have generally required such subsequent advances of new value to "provide the debtor with a material benefit." *Id.* at 1084, *See also, In re Fulghum Const. Corp.,* 45 B.R. 112 (Bankr. M.D.Tenn.1984), *aff'd,* 78 B.R. 146 (M.D.Tenn.1987); *In re Quality Plastics, Inc.,* 41 B.R. 241 (Bankr.W.D.Mich.1984). The determination of whether or not a material benefit has been conferred has been explained in terms of protecting a creditor who has received a preferential payment "to the extent that the creditor thereafter replenishes the estate." *Jet Florida,* 841 F.2d at 1084. Courts have found a material benefit to the debtor that constituted new value in a variety of circumstances. For example, payments need not be made directly to the debtor to be considered new value as long as they are made for the benefit of the debtor. In

*Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275 (8th Cir.1988), the court found new value where the creditor had made payments directly to a third party on behalf and for the benefit of the debtor. The court stated that these payments "augmented" the estate in a manner contemplated by the language of the section, as it allows for new value to be given to or for the benefit of the debtor. *Id.* at 1280. Further, courts have found new value in the amount of the value of insurance coverage provided after the payment of delinquent premiums,[2] the value of leased equipment when the lessor allowed the debtor to continue to use the equipment after defaulting on rental payments,[3] and the value of electricity supplied to a debtor after preferential payments were made.[4] *Jet Florida,* 841 F.2d at 1084. On the other hand, in *Jet Florida,* the court found that the creditor's forbearance in evicting the debtor from rental property did not confer a benefit on the debtor sufficient to constitute new value when the debtor did not use or occupy the rental property during the preference period. *Id.* at 1084. Similarly, the products manufactured by T & M that are the basis of their defense were not even shipped to MPS, let alone used by them.

Moreover, the court in *In re Teligent* stated that the relevant inquiry in a determination of new value is "whether the

1275 (8th Circ.1988) for the proposition that equitable treatment of creditors is not a policy consideration underlying the assessment of new value in preference litigation. To the extent that the *Bellanca* decision conflicts with the *Jet Florida* decision on this point, *Jet Florida* controls and the Court must consider equitable treatment of creditors an underlying policy of this section of the Bankruptcy Code. In addition, the *Bellanca* court opined that the "clear intent of Congress" is that "new value advanced by creditors should be available to debtors in the conduct of their busi-

ness." *Bellanca,* 850 F.2d at 1280. Clearly, the parts manufactured by T & M were not available to MPS as the parts were being held in T & M's inventory storage facility.

2. *In re Dick Henley, Inc.,* 45 B.R. 693, 699 (Bankr.M.D.La.1985).

3. *Quality Plastics,* 41 B.R. at 243

4. *In re Keydata Corp.,* 37 B.R. 324, 328–29 (Bankr.D.Mass.1983).

defendant replenished the debtor's estate, and hence, negated the prejudicial effect of the preference," as reflected in the "definition that limits" "new value" to "money or money's worth in goods, services, or new credit." *Teligent,* 315 B.R. at 317. The Court held that a promise to deliver services at a future date did not "replenish" the estate; only the actual delivery would have replenished the estate. *Id.* Likewise, T & M's manufacture of the goods does not replenish the estate, although the actual delivery of the goods, were they accepted by MPS, would have replenished the estate. The goods sitting in T & M's warehouse were worth nothing to the debtor or to the estate.

Further, T & M has cited no case, and the Court could not locate one, in which a court has held that the contractual production of specialty goods without their delivery to the buyer/debtor is sufficient to constitute new value which would thwart an attempt by the debtor to avoid a preferential transfer. To the contrary, the single bankruptcy case the Court found that deals with the manufacture of specialty goods in a new value/preferential transfer context, *Gander Mountain, Inc. v. Ventrice (In re Gander Mountain, Inc.),* 24 B.R. 827 (Bankr.E.D.Wis.1982), rejected the narrower argument that a creditor is entitled to "set off" the expenses it incurred in producing the specialty product (in this case, belt buckles) against the preference payment. The court stated that "a common sense interpretation of § 547(c)(4)... leads to the inescapable conclusion that a debtor must have *received and retained* money, goods, services, or other property in order for the unsecured transferring creditor to avoid returning all or part of a preferential payment" *Id.* at 828 (emphasis added). MPS did not receive any money, goods, services, or other property from T & M.

Therefore, in light of the Eleventh Circuit's decision in *Jet Florida,* including its articulation of the policy considerations involved, and after consideration of the available caselaw on the issue, I conclude that the Net Preference Amount is not subject to the new value defense and must be repaid to the estate. T & M's production of the specialty goods, standing alone, did not confer a benefit on the debtor, nor did it enhance or replenish the estate. The fact that the goods were produced and potentially even available to MPS does not change the fact that delivery was not made. The only significance of the special nature of the goods is that it may establish the basis for a debt owed to T & M by MPS. However, since MPS did not receive anything of any value from T & M, T & M's affirmative defense of new value must fail.

## CONCLUSION

For the reasons articulated above, I find that there are no genuine issues of material fact in this case. As a matter of law, the $280,631.00 preferential transfer at issue is not subject to the defense of "new value" found in 11 U.S.C. § 547(c)(4). Accordingly, it is hereby

ORDERED AND ADJUDGED that the Plaintiff's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED AND ADJUDGED that the Defendant's Motion for Summary Judgment is denied.