**In re RUSSELL CAVE COMPANY, INC. f/k/a The J. Peterman Company, Debtor.**

No. 99–50142.

United States Bankruptcy Court, E.D. Kentucky, Lexington Division.

Sept. 27, 2000.

---

17. 11 U.S.C. § 363 (1994).

18. 11 U.S.C. § 362 (1994).

W. Timothy Miller, Cincinnati, OH, for Official Committee of Unsecured Creditors.

Edward M. Fox, New York City, Randy P. Shaw, Lexington, KY, for Donald Staley.

## *MEMORANDUM OPINION*

WILLIAM S. HOWARD, Chief Judge.

This matter is before the Court on the Objection of the Official Committee of Unsecured Creditors ("the Committee")to the claim of Donald Staley ("Staley"), evidenced by his proof of claim # 3077 in the amount of $1,240,595.87. The Committee's objection first appeared as part of its Objection ... to Pre–Petition Employee Claims (Doc. # 604). Upon the filing of that Objection, Staley filed a Memorandum of Law in Support of Opposition to Objection to the Official Committee of Unsecured Creditors to Pre–Petition Claims of Donald Staley (Doc. # 758). The Committee then filed its Supplemental Objection ... to Claim of Donald Staley (Doc. # 853), which set out in detail its objection to Staley's proof of claim. The debtor has also filed an Objection to Claim of Donald Staley (Doc. # 859), and an Amendment to Objection (Doc. # 1001), but has with-

drawn from active pursuit of its objections, allowing the Committee to argue the case for the denial or limitation of Staley's claim. Both parties have filed further briefs. The parties have also entered into extensive Joint Stipulations (Doc. # 1094), which are incorporated herein by reference.

Staley, an advertising copywriter, had been associated with the debtor, a clothing and fine goods retailer, since helping to found it (as The J. Peterman Company) in 1987. Staley and his firm Staley Fox produced the debtor's signature catalogs from his apartment in New York City. He prepared the copy and artist Robert Hagel prepared the illustrations. As the job of producing catalogs grew, Staley started referring out a portion of the copywriting for each catalog to freelance writers, and Mr. Hagel, after consulting with Staley and obtaining his approval, referred some of the artwork to freelance artists. The catalogs were produced without supervision or control by the debtor. A provision concerning this freedom from interference was incorporated into the Consulting Agreement referred to below.

The freelance copywriters and artists were generally paid on a per item basis, at higher than market rates, set by Staley. They would submit bills for their services and expenses to Staley Fox, and Staley Fox would bill the debtor. In addition, Staley Fox would bill the debtor for Staley's monthly retainer (referred to as an "Agency Fee"), and for expenses he had incurred. Staley Fox did not provide the debtor with supporting documentation for the amounts billed, and the debtor did not request such documentation. Staley did not record or report the hours he worked on advertising services for the debtor. The invoices submitted by Staley Fox were promptly paid until immediately before the filing of this Chapter 11 case.

Up until July 23, 1997, Staley was a member of the debtor's Board of Directors. Further, there was no formal, written agreement between Staley or Staley Fox and the debtor concerning the advertising services provided prior to that time. In June 1997, two venture capital firms agreed to invest in the debtor, and in connection therewith required that Staley enter into a written consulting agreement ("the Consulting Agreement").

Under the Consulting Agreement, Staley agreed to provide advertising services to the debtor for three years and agreed to a non-compete clause which prohibited him from providing services to a catalog retail competitor of the debtor for a year after the termination of the Consulting Agreement. Staley's fee was set at $300,000.00 per year, approximately the same fee he had been receiving since 1994. Staley was also eligible for certain bonuses under the Consulting Agreement. The Compensation Committee of the Board of Directors never set Target Goals, as that term is defined in the Consulting Agreement for purposes of determining any extra compensation which Staley might receive. The bonus plan reflected in the Consulting Agreement was not outlined and defined by the Compensation Committee.

The investors further required that Staley resign from the Board of Directors. In connection therewith, he submitted a letter on July 23, 1997, resigning from the Board effective that day. He also executed the signature page of the Consulting Agreement on July 23, 1997 and delivered this, along with his letter of resignation, by facsimile transmission to the office of counsel for the investors on the same date.

Staley never had federal, state or local taxes, health insurance costs or pension contributions deducted from his consulting fees. He was responsible for paying taxes on all amounts he received from the debtor. He could not participate in any of the benefits programs available to principals of the debtor John Peterman, Arnold Cohen and John Rice. Further, these principals received salaries without the submission of invoices. Staley never had an office at the debtor's headquarters in Lexington, Ken-

tucky, although he attended meetings there. Until December 1998, the debtor paid $524.20 per month in life insurance premiums for Staley. The debtor did not own the life insurance policy.

■ The Court first considers the validity of Staley's claim, and the Committee's objection to it. As stated in *In re Allegheny Intern., Inc.*, 954 F.2d 167 (3rd Cir.1992),

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is *'prima facie'* valid. .... In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence in equal force to the *prima facie* case. .... In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. .... The burden of persuasion is always on the claimant. (Cites omitted.)

At pages 173–174. *See also In re Fullmer*, 962 F.2d 1463 (10th Cir.1992). The Committee's challenge to the validity of Staley's claim addresses both an arrearages claim portion in the amount of $159,095.87 and a termination damages claim portion in the amount of $1,081,500.00.

■ As concerns the arrearages portion, the Committee contends that because invoices attached to the claim were issued by Staley Fox or to Staley Fox for freelance work, they provide no evidence of a claim against the debtor by Staley. This contention is based on the fact that the Consulting Agreement provides that Staley's "obligation for services under this Agreement are personal and may not be assigned." The Consulting Agreement makes no mention of Staley Fox. The Committee argues that this indicates that the claimant is actually Staley Fox or that Staley attempted to delegate his duties under the Consulting Agreement to Staley Fox.

This reasoning ignores the fact that the course of dealing among the parties was that the debtor never differentiated between Staley and Staley Fox. The invoices for Staley's work and that of the freelancers were submitted by Staley Fox on its stationery, and the invoices were always paid. Staley and Staley Fox were treated as essentially the same entity. The language contained in the Consulting Agreement appears to speak more to the investors' desire to bind Staley to the debtor exclusively, rather than a concern over or interest in the name on the bills. The invoices are sufficient to support the *prima facie* validity of the arrearages portion of Staley's claim. The Committee has not adduced facts sufficient to overcome the presumption of validity by virtue of the billing by Staley Fox. Staley has agreed that a $2,700.00 adjustment should be made on this portion of his claim, and that the total arrearages claim is $156,395.87.

■ The Committee has further challenged the evidentiary sufficiency of the termination damages portion of Staley's claim. The $21,000.00 Accrued Annual Base Fee has already been determined to be included in the arrearages claim, and that amount is eliminated from this portion of the claim. The other amounts set out in that portion of the claim are the $150,000.00 Accrued Annual Incentive Bonus, the $10,500.00 Pro Rata Annual In-

centive Bonus, the $300,000.00 Target Bonus, and the $600,000.00 Annual Base Fee (for two years from rejection) are challenged on the basis that they are not supported by the terms of the Consulting Agreement.

Section 7.3 of the Consulting Agreement deals with termination for material breach. It states:

> If there is a Termination of Consulting Service Without Cause or a termination of the consulting services by the Consultant for Material Breach, the Consultant shall receive the following: (a) immediately after the Date of Termination in lump-sum in immediately available funds, an amount equal to the sum of (1) the Consultant's Accrued Annual Base Fee, and (ii) any Accrued Annual Incentive Bonus, and (iii) the Consultant's Prorata Annual Incentive Bonus and (b) beginning one month following the Date of Termination in equal installment payments over the remainder of the Contract Term (or if greater, two (2) years), an amount equal to the product of (i) the number of years (stated as whole and fractional years) remaining in the Contract Term as of the Termination Date or if greater than two (2) years, multiplied by (ii) the sum of the Annual Base Fee and the Target Bonus determined based upon the amount of gross revenues of the Company for the Fiscal Year immediately preceding the Date of Termination.

Section 1.27 of the Consulting Agreement defines the term "Material Breach." The pre-petition breach under the Consulting Agreement is set out at Section 1.27(c) as

> the failure of the Board to form, elect and reelect a committee (the "Compensation Committee") comprised of John Peterman (or if John Peterman shall no longer be a member of the Board, then Arnold Cohen), an Investor Director and upon electing [an] Independent Director in accordance with 1.27(d) hereof an Independent Director to administer and make all compensation and benefits de-

terminations under this Agreement including but not limited to setting Target and Threshold Goals for the Annual Incentive Bonus in accordance with Section 4.2, or the failure of such Compensation Committee to so administer this Agreement including, but not limited to setting Target and Threshold Goals for the Annual Incentive Bonus in accordance with Section 4.2.

Section 4.2 provides that Staley would be paid the Annual Incentive Bonus for each of the three calendar years encompassed by the Agreement. Staley was "eligible" for an Annual Incentive Bonus as a percentage of his Annual Base Fee (the Target Bonus) depending on the debtor's earnings for the year in question. He was further "eligible" for an Annual Incentive Bonus equal to 40% of whatever the Target Bonus amount was.

Included in the provisions concerning "Material Breach," however, is the following pertinent language:

> Notwithstanding the foregoing, no act or omission by the Company shall constitute Material Breach hereunder unless the Consultant gives the Company thirty (30) days prior written notice of the act or omission which constitute (sic) Material Breach and the Company fails to cure such act or omission within the thirty (30) day period . . .

The prepetition breach in this matter is the failure of the Compensation Committee to set Target and Threshold Goals for the Annual Incentive Bonus. The bonus amounts that Staley was "eligible" for, and that he claims here, were never set. In order for this omission to be considered a Material Breach, Staley ("the Consultant") had to give the debtor thirty days notice of the omission, with the debtor then having the opportunity to cure. There is no evidence in the record that Staley ever gave the debtor the requisite thirty days notice. Therefore there can be no Material Breach in regard to amounts claimed as Accrued

Annual Incentive Bonus, Pro Rata·Annual Incentive Bonus, and Target Bonus.

■■■■ As concerns Staley's claim for an amount equal to twice his Annual Base Fee, or $600,000.00, the significant event is the debtor's postpetition rejection of the Consulting Agreement. Pursuant to 11 U.S.C. § 365(g), the rejection of an executory contract of the debtor constitutes a breach of that contract. Pursuant to Section 7.3 of the Consulting Agreement, Staley is entitled to the amount claimed. The giving of notice is not at issue here, as rejection of the Consulting Agreement was not a Material Breach defined in the Consulting Agreement, and it would be pointless for Staley to be required to give the debtor notice of an action it had chosen to take in its bankruptcy case. In summary, the Court concludes that Staley has a valid total claim in the amount of $756,395.87, the sum of $156,395.87 in arrearages and $600,000.00 in termination damages.

■■■■ The next issue to be determined is whether this total amount is limited by 11 U.S.C. § 502(b)(4) or § 502(b)(7), or both. These sections deal with claims of insiders and employees, respectively. The Court will first address § 502(b)(4). That section provides that:

> (b) if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> (4) If such claim is for the services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services.

An individual's status as an insider was dealt with by the court in *Allegheny Intern., supra.* There the court stated:

> Courts have construed the definition of an insider flexibly. An insider has been defined as any entity or person with a "sufficiently close relationship with the debtor that his conduct is made

subject to closer scrutiny than those dealing at arms length with the debtor." *In re Acme–Dunham, Inc.,* 50 B.R. 734, 739 (D.C.Me.1985).

[The debtor] argues that because [the claimant] was an officer and director of the debtor, he was an insider. [The claimant] asserts, however, that because 11 U.S.C. § 502(b) uses the language "as of the date of the filing of the petition," that this is the appropriate time for deciding if one is an insider. He maintains that since he was not·an insider when [the debtor] went into bankruptcy, he is not an insider for the purposes of 11 U.S.C. § 502(b)(4).

The phrase "as of the date of the filing of the petition," however, modifies the amount of the claim. Further, insider in this context relates to the services performed. The contract services·were services of an insider.

This court has previously decided that the relevant time for determining one's status as an insider, under 11 U.S.C. § 502(b)(4), is the time services were rendered and when the compensation contracts for such services were formed. (Cite omitted.)

*In re Allegheny Intern., Inc.,* 158 B.R. at 339. Staley was a founder of The J. Peterman Company. He considered himself the voice and conscience of the company. He produced the signature catalogs that were the foundation of the business, and had unfettered control over every aspect of their production. He sat on the Board of Directors until 1997, when the investors required that he be removed. At the same time they required that he enter into a written Consulting Agreement, to guarantee that his crucial services remained devoted to the debtor. It is clear that he was an insider, and as such his claims are subject to the terms of 11 U.S.C. § 502(b)(4).

■■■■ Staley further argues, however, that his claim should be allowed in its entirety as reasonable, even if § 502(b)(4) applies. The Committee contends that

Staley's entire termination damage claim should be disallowed, as well as $44,323.79 of the arrearage claim, representing Staley's January 1999 Agency Fee and January 1999 retainers for Robert Hagel and a copywriter, Amy Bloom. This Court disagrees. As concerns the determination of the "reasonable value" of the claim, the court in *In re Tamarack Trail Co.*, 30 B.R. 99 (Bkrtcy.S.D.Ohio 1983), stated:

> As to a claim for services of an insider the statute enjoins us not to allow such claims which exceed the reasonable value of any services. 11 U.S.C. § 507(b)(5) (now § 502(b)(4)). We conceive the significance of this statutory provision for present purposes to be that it creates a burden which a claimant must bear in order to succeed in his claim. The burden which must be borne is that claimant prove that the claim asserted is reasonable value for services rendered.

At 101. This reasoning speaks to what this Court believes is the intent of § 502(b)(4), i.e., that the claims of insiders are to be subjected to intense scrutiny, not that an insider should never have a claim for future damages under an employment or other contract for his services. The Court concludes that the reasonable value of Staley's services pursuant to 11 U.S.C. § 502(b)(4) is $756,395.87.

■■■ Next the Court considers whether Staley's claim is limited by 11 U.S.C. § 502(b)(7). This section provides for the payment of a claim under § 502(b) except to the extent that

> (7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds
>
> (A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
>
> (i) the date of the filing of the petition; or
>
> (ii) the date on which the employer directed the employee to terminate, or

such employee terminated, performance under such contract; plus

> (B) any unpaid compensation due under such contract without acceleration, on the earlier of such dates.

The Committee contends that Staley was an employee for purposes of this statute, and that the Consulting Agreement was an employment contract. In support of its position the Committee cites *In re Wilson Foods Corp.*, 182 B.R. 278 (Bkrtcy.D.Kan. 1995), in which a claimant alleged that she was an independent contractor whose contract to provide consulting services did not make her an employee of the debtor. The court disagreed.

The *Wilson Foods* court stated that the purpose of § 502(b)(7) is to

> strike a fair balance between claimant-creditors who have secured long-term contracts resulting in large unsecured claims and the claims of numerous other unsecured creditors seeking pro rata payment from the all-too-often meager assets left for unsecured creditor distribution.

At 281. The court went on to analyze whether the claimant fell into the camp of those who had "secured long-term contracts resulting in large unsecured claims." It determined that she did.

The claimant had been a party to a three year "Employment Agreement" with the debtor, with the possibility of renewal for a similar term ("the Employment Period"). When the Employment Period was not renewed, the Employment Agreement provided that she was to serve as a consultant for a period of seven years ("the Consulting Period"). While serving as a consultant she received yearly consulting fees payable monthly, and had to estimate and pay her own taxes. She had no authority to direct the work of any employee, and her consulting services were not subject to control or direction. She was subject to non-disclosure and non-compete clauses, and the Employment Agreement was only assignable under certain circum-

stances. *In re Wilson Foods Corp.*, 182 B.R. at 279–280.

In response to the claimant's argument that it was the degree of control which the debtor exercised over her activities which determined her status as an employee or an independent contractor, the court stated that while this was a determinative factor under agency principles, it was irrelevant for purposes of § 502(b)(7). The court found that

> there is no indication that [the claimant] and Wilson Foods had anything but an employment contract governing what amounted to an employment relationship. The terms contained in the written contract, delineated an "Employment Agreement," evidenced an employment relationship between [the claimant] and the debtor.....
>
> Moreover, [the claimant's] consulting contract was contained in the same "Employment Agreement" that provided for her executive vice-presidency, justifying the inference that [her] influence or expertise was considerable enough that she was able to secure a consulting contract at the same time as her executive vice presidency contract.

At 283. While this Court does not agree that control over activities is a non-factor in § 502(b)(7) considerations, the critical difference between the claimant in *Wilson Foods* and Staley, the claimant here, is that her consulting contract was part and parcel of the **employment contract** which she, at least by inference, had a role in negotiating.

Staley never entered into an employment contract with the debtor. In fact, he never had any kind of written agreement with the debtor until the investors insisted that he enter into the Consulting Agreement. It was presented to him as a *fait accompli;* he did not seek such an agreement and had no part in its creation or negotiation. Further, Staley runs his own business, a business which provided essential services to the debtor. These services were provided from a location hundreds of miles away from the debtor, totally under Staley's control. He was not paid a salary. He was guaranteed a certain yearly fee, but had to submit invoices for payment for services provided and expenses incurred. He was not eligible for any of the benefits available to high-ranking employees such as John Peterman, John Rice, and Arnold Cohen. This Court is of the opinion that the debtor had a somewhat unusual, almost symbiotic relationship with Staley, but that he always operated as an independent contractor and was not an employee in any sense of the word. His claim is therefore not subject to the limitations of 11 U.S.C. § 502(b)(7).

In consideration of all of the foregoing it is the opinion of this Court that Donald Staley's claim should be allowed in the amount of $756,395.87. An order in conformity with this opinion will be entered separately.